West Penn Power Company, Petitioner v. Pennsylvania Public Utility Commission, Pennsylvania Rural Electric Association and Central Electric Cooperative, Inc., Respondents.

Argued September 11, 1980, before Judges BLATT, CRAIG and MACPHAIL, sitting as a panel of three. Reargued February 3, 1981, before President Judge CRUMLISH and Judges WILKINSON, JR., MENCER, ROGERS, BLATT, CRAIG, MACPHAIL, WILLIAMS, JR. and PALLADINO.

*Franklin L. Morgal,* with him *Drew J. Kovalk,* for petitioner.

*John F. Povilaitis,* Assistant Counsel, with him *Shirley Rae Don,* Deputy Chief Counsel, and *George M. Kashi,* Chief Counsel, for respondent, Pennsylvania Public Utility Commission.

*William E. Mowatt,* with him *Miles R. Lynn, Jr.,* and *Anthony C. Adonizio,* for respondent, Pennsylvania Rural Electric Association.

OPINION BY JUDGE BLATT, November 13, 1980:

The petitioner, West Penn Power Company (West Penn), appeals here from a determination by the Pennsylvania Public Utility Commission (Commission) that West Penn extended electric service to a new customer outside of its certified territory and that it encroached upon the territory of the respondent, Central Electric Cooperative, Inc. (Central Electric).

Territory disputes between electric utilities in unincorporated areas are governed by the Retail Electric Supplier Unincorporated Area Certified Territory Act (Territory Act), Act of July 30, 1975, P.L. 113, 15 P.S. §3277 *et seq.* Section 5(b) of the Territory Act, 15 P.S. §3281(b) provides:

> [A]ny new electric-consuming facility located in an unincorporated area which has not as yet been included in a map issued by the commission . . . shall be furnished retail electric service by the retail electric supplier which has an *existing distribution line* in closer proximity to such electric-consuming facility than is the nearest existing distribution line of any other retail electric supplier. (Emphasis added.)

The controversy here involves the Commission's determination that the nearest electric line of West Penn to the new customer is not an "existing distribution line", whereas the nearest electric line of Central Electric is such a line.

The nearest West Penn line is a 25,000-volt (25-KV) line in Madison Township, Clarion County, running in a northerly direction between two West

Penn substations which are about 11,000 feet apart. At the northernmost substation, known as the Catfish Hollow substation, the current is transformed from 25 KV to a voltage of 2.3 KV, and it is then distributed to customers farther to the north where it is further reduced by transformers to the usable household current of 120/240 volts. In 1978, Thomas Bump, a resident of Madison Township, requested that West Penn extend electric service to his residence which is approximately 163 feet east of the mid-point of the 25-KV line between the two substations. West Penn extended service to Mr. Bump through the construction of a 2.3-KV "underbuilt" line which originates at the southernmost substation and runs along the existing poles which carry the 25-KV line.[1] The 2.3-KV underbuilt line runs for approximately 2,200 feet[2] to the midpoint of the 25-KV line where it turns east and runs 163 feet across new poles to the Bump residence where it is further transformed to 120/240 volts.

Central Electric, on the other hand, owns and operates a 7.2-KV line in Madison Township which is 365 feet east of the Bump residence. Central Electric contends here that it would have served Mr. Bump by extending its 7.2-KV line to his property and using a transformer on the poles to reduce the current to 120/240 volts.

An "existing distribution line" is defined in Section 2 of the Territory Act, 15 P.S. §3273, as "an electric line of a design voltage of 35,000 volts phase

---

[1] It is unclear from the record whether or not the 2.3-KV underbuilt line extends from the substation itself or whether it extends from another 2.3-KV line in the vicinity of the substation.

[2] The new 2.3-KV underbuilt line which was constructed to serve Mr. Bump is actually a 2,200 foot extension of an existing 2.3-KV underbuilt line which originates at or in the vicinity of the substation.

to phase or less which on the effective date of this act . . . (ii) *is being or has been used for retail electric service.*" (Emphasis added.) It is undisputed that West Penn's 25-KV line meets the requirements of Section 2 to the extent that it is less than 35,000 volts and is located in an unincorporated area. The sole remaining requirement which West Penn's 25-KV line must meet to be an "existing distribution line," therefore, is that it "is being or has been used for retail electric service."

"Retail electric service" is inadequately defined in Section 2 of the Territory Act, 15 P.S. §3278, as "electric service furnished to a consumer for ultimate consumption, but does not include wholesale electric energy furnished by an electric supplier to another electric supplier for resale." The Commission concluded as a matter of law that, because West Penn's 25-KV line runs between two substations and does not directly feed power to any customers between the substations, the 25-KV line does not provide retail electric service and is therefore not an "existing distribution line" for the purposes of determining West Penn's territorial boundary. As a result, the Commission concluded that the nearest "existing distribution line" to the Bump property is Central Electric's 7.2-KV line.

Our review of Commission adjudications is to determine whether or not constitutional rights were violated, an error of law was committed, or the findings were supported by substantial evidence. *Manufacturers' Association of Erie v. Pennsylvania Public Utility Commission*, 47 Pa. Commonwealth Ct. 31, 407 A.2d 114 (1979). Here, although the findings of the administrative law judge are based on substantial evidence, we cannot accept the conclusion of law drawn from these facts that West Penn's 25-KV line is not being used for "retail electric service."

The only practical distinctions between West Penn's 25-KV line and Central Electric's 7.2-KV line which we can discern from the findings are that (1) the 25-KV line is, of course, operated at a higher voltage, and (2) prior to usage by the ultimate customers, the current of West Penn's 25-KV line is reduced in voltage by a substation while Central Electric's 7.2-KV line is reduced by a transformer.

The first distinction is clearly irrelevant, for the definition of "existing distribution line" in Section 2 of the Territory Act, 15 P.S. §3278, specifically permits lines of up to 35 KV to be characterized as "existing distribution lines."

Nor is the second distinction a valid basis for the Commission's order. The fact that the 25-KV line does not serve any customers between the two substations does not controvert the fact that its sole purpose is to provide retail electric service to customers north of the Catfish Hollow substation, and that without the 25-KV line, these customers would not have electricity.

Moreover, as West Penn's representatives testified and as the administrative law judge implicitly recognized in his opinion, although it is possible to reduce a 25-KV current through the use of a transformer, substations are the safer and more economical method for such large reductions.[3] Thus, the

---

[3] The opinion of the administrative law judge, adopted by the Commission, states:

[West Penn] argues that the line in question was placed in existence to serve certain customers (those in Kissinger Mills). *It argues that it could have placed transformers along the line and served customers directly, but preferred for economic and safety reasons, to send the electricity to the customers through a substation rather than through transformers.* It argues that the effect is the same, and that the line is not meant to transport electricity from

Commission's conclusion that the 25-KV line is not an "existing distribution line" because it does not connect to any customers between the substations necessarily assumes that the legislature intended that high voltage lines less than 35 KV, such as West Penn's, would be classified as "distribution lines" only if they directly served retail customers without reduction at a substation. Such direct service would require that utilities transform the high voltage current to 120/140 volts by means of transformers rather than substations. However, because this method is less safe than West Penn's method, we must conclude that the legislature did not intend such a result.

In addition, a consonant reading of the definitions of "existing distribution line" and "retail electric service" indicates that the legislature sought to exclude from boundary determinations those electric lines which carry a current greater than 35 KV and those which provide "wholesale electric energy furnished by an electric supplier to another electric supplier for resale." West Penn's 25-KV line fits neither of these exclusions.

---

one point to another, but has as its purpose the serving of certain retail customers.

. . .

*While West Penn is to be commended for the use of substations for safety and economic reasons,* I believe that the Act as [sic] presently exists does, in effect, "penalize" them for using the lengthy underbuilt line from the substation as its method of providing appropriate stepped-down voltage to the residence in question. To my way of thinking, the comments in 15 P.S. 3279 as to the reasons behind the Act, i.e. avoid waste of materials and natural resources, etc., strongly suggest that *if the only safe way for one of two suppliers to serve a customer is a 2,200 ft. underbuilt line, then the other supplier with an appropriate line only 365 ft. away should be the one to supply the energy.* (Emphasis added.)

Finally, a close reading of the administrative law judge's opinion reveals that the practical basis for the Commission's order was that West Penn extended service through the use of a 2,200-foot underbuilt line, whereas Central Electric would have extended service from a point only 365 feet from the Bump residence through the use of a transformer on its 7.2-KV line. The Territory Act, however, does not provide that such a post facto consideration should govern the definition of "existing distribution line." To the contrary, Section 4(b) of the Territory Act, 15 P.S. §3280, provides only that boundaries are set at a line "equidistant between. [a utility's] existing distribution lines and the nearest existing distribution lines of any other retail electric supplier."[4] The Territory Act does not require, therefore, that actual extensions to new customers be made from the point of the "existing distribution line" which is nearest to the new customer, although this would often be the case.

Because we have concluded that West Penn's 25-KV line in Madison Township is an "existing distribution line" for the purposes of Section 5(b) of the Territory Act, 15 P.S. §3281(b), the order of the Commission must be reversed.

---

[4] The administrative law judge relies on Section 3 of the Territory Act, 15 P.S. §3279, which states that the policy of the Territory Act is to provide economical service, as his basis for concluding that West Penn's construction of a 2,200 foot underbuilt line violated the Territory Act. Even if we were to hold that the efficiency of the method that a utility uses to extend service to a new customer is relevant to the determination of whether or not that new customer is within the utility's territory, nevertheless, the record is far from clear that West Penn's 2,200-underbuilt line and 165-foot new-pole line was in fact less economical than Central Electric's proposed 365-foot extension on new poles.

ORDER

AND Now, this 13th day of November, 1980, the order of the Pennsylvania Public Utility Commission in the above-captioned case is reversed.

ORDER

AND Now, this 27th day of March, 1981, after granting the application of the Respondent, Pennsylvania Public Utility Commission, for reargument of the above-captioned case, which was originally argued before a panel of Judges of this Court on September 11, 1980 and originally decided on November 13, 1980, and upon consideration of the positions advanced by the parties and amicus curiae at the reargument of the above-captioned case before this Court sitting en banc on February 3, 1981,

IT IS HEREBY ORDERED that this Court's opinion and order dated November 13, 1980, which reversed the order of the Pennsylvania Public Utility Commission in the above-captioned case, is confirmed and adopted as the opinion and order of this Court sitting en banc.

This decision was reached prior to the expiration of the term of office of Judge WILKINSON, JR.